GRISBAUM, Judge.
This appeal concerns a suit by a longshoreman under § 905(b) of 33 U.S.C. § 901 et seq., the Longshoremen’s and Harbor Workers’ Compensation Act (L.H. W.C.A.). The plaintiff, Jerry Kerr, was working for A & H Armature as an electrician/troubleshooter aboard the M/V Farmer’s Express when a collision caused him to fall on his buttocks, injuring his back. He sued the vessel owners and insurers of the M/V Farmer’s Express. Liberty Mutual Insurance Company (Liberty), the compensation carrier of the plaintiff’s employer, intervened to recover from the third-party tortfeasor (the vessel owner and its insurer) all sums paid by it as a result of the plaintiff’s injuries. Three parties appeal: the plaintiff, Jerry Kerr; Liberty, the compensation payor/intervenor; and Gordan Hackman/Gordan Hackman, P.L.C., the in-tervenor/discharged attorney. We revise, and as revised, affirm.
ISSUES
We are called upon to determine two principal questions:
(1) Whether the trial court erred in its finding that the accident and resulting injuries aboard the M/V Farmer’s Express caused 20 percent of the injuries and damages suffered by the plaintiff, and
(2) Whether the trial court erred in reducing Liberty’s reimbursement for compensation and medical benefits to 20 percent of the amount actually disbursed by them on the plaintiff’s behalf.
FACTS
The basic facts are not in dispute. The plaintiff was a harbor worker under the provisions of the L.H.W.C.A., and the vessel owner, Blue Sky Marine, Inc., admitted liability in tort under 33 U.S.C. § 905(b). Liberty made voluntary payments of compensation to the plaintiff after his injury on November 14, 1979 because it is the com *192 pensation carrier of Kerr’s employer, A & H Armature.
The principal dispute concerns the extent to which the November 14, 1979 fall aboard the M/V Farmer’s Express contributed to the plaintiff’s lower back injuries, when the plaintiff has a complex history of lower back injuries, problems, and medical interventions that spans 14 years.
ANALYSIS — ISSUE ONE
Our jurisprudence states that a plaintiff must prove causation by a preponderance of the evidence; that is, the evidence must show that it is more probable than not that the harm complained of was caused by the defendant’s conduct. Napoli v. State Farm Mut. Auto Ins. Co., 387 So.2d 1351 (La.App. 1st Cir.1980), writ granted, 392 So.2d 694 (La.1980), aff’d, 395 So.2d 720 (La.1981). A finding of causation is a finding of fact and, as such, is subject to the well-settled standard of review set forth in Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
We are convinced, after a careful review of the record, that the trial judge’s analysis contained in her Reasons for Judgment reflects an objective balancing of the testimony of medical experts and laymen. The record more than adequately supports her findings of fact under the Arceneaux scrutiny. Dr. Harold M. Stokes, the defendant’s expert witness in the field of orthopedics, stated he believed the original cause for Kerr’s back problems was the 1972 injury that led to the 1973 surgery. His assessment of the chain of events leading to the surgery in 1980 involved a combination of three things: Kerr’s condition before the 1979 injury, the 1979 injury, and the 1980 automobile accident. This is more realistic than the belief of Dr. Robert Fleming, the plaintiff’s long-time treating physician, that the 1979 accident was the “greater contributor” to the plaintiff’s problems. Objective evidence shows that: (1) Kerr was a candidate for surgery in 1974 due to his degenerative disc disease and instability, according to hospital records; (2) the 1978 myelogram and hospital and doctor’s reports indicate that Kerr would have eventually needed surgery at some point after his 1978 myelogram, regardless of what else happened to his back; (3) in Stokes’ opinion, the defects present in the 1978 and 1979 myelograms were “precisely the same,” and he explained that because of the location of the plaintiff’s problem, the different types of dye used in the two myelograms would not affect the reading of them; and (4) the kind of disc disorder that revealed itself in the 1978 myelogram does not “go away by itself” and is different in nature from a muscle strain because muscle strains eventually improve; disc disorders do not.
Stokes further stated on redirect that, based on the treatment records of Jerry Kerr, the event triggering the renewed recommendation for surgery in 1980 was the 1980 car wreck. However, he admitted under cross-examination that he could not tell the court the degree of the effects the 1980 accident had on the plaintiff. Lastly, he noted on direct that “there was probably some injury to the whole spine” in the 1982 accident, but he could not comment on the degree of injury inflicted by that accident.
Kerr’s 1972 injury was so severe that Dr. Fleming classified him as “totally disabled” for a time, enabling the plaintiff to collect social security from 1975-1977. When asked to describe the pain experienced at the moment the 1979 injury took place, the plaintiff stated, “I would have to say it was probably the same level as the pain I experienced when I was injured in 1972, and significantly greater than any pain I had up to that point. And I don’t believe I’ve ever experienced any pain like that since.” (emphasis added.) The plaintiff tried to downplay the symptomology triggered by the 1980 collision by stating that, after the accident, he only went to Dr. Fleming’s office to get new prescriptions to keep his medication current. That is highly unlikely for the following reasons. The plaintiff did not see Dr. Fleming for several months before the 1980 car wreck, supposedly because he felt the only two options he had were to tolerate the pain and do as best he could, or have the surgery, and he did not want to have the surgery as long he could tolerate the pain. The 1980 car wreck *193 must have played a significant role in triggering the surgery, given the pre-1980 accident three-month hiatus in treatment, followed by the post-1980 accident office visits on the following dates: August 29, 1980; September 5, 1980; September 12, 1980; September 16, 1980; September 17-22, 1980 (plaintiff was hospitalized); October 3, 1980; October 28-November 6, 1980 (plaintiff underwent fusion surgery). It is significant Dr. Fleming stated that, although the 1980 collision may have been the triggering factor, he didn’t think it was, based on what the plaintiff told him. The defendant’s skillful cross-examination of the plaintiff provided a revealing glimpse of the credibility of the man whose statements served as the basis for Dr. Fleming’s causation evaluation. Moreover, Dr. Fleming admitted under cross-examination that in the admission history and physical prepared by him just before the plaintiff’s surgery in 1980, he stated the plaintiff’s condition, until the August 25, 1980 accident, was improving.
Lastly, Dr. Fleming repeatedly diagnosed the plaintiff’s back problems as “recurrent lumbar sprain with pain the left lower extremity,” starting with the 1978 fall down the stairs. In 1979, the diagnosis was severe “lumbar sprain superimposed upon traumatic arthritis,” and he admitted that the traumatic arthritis related back to the fall of 1972 and the surgery of 1973. Dr. Fleming characterized a sprain as a tearing or pulling of the soft tissues. The sprain is a different kind of injury altogether than the “traumatic arthritis” upon which it is superimposed. Common sense tells us that a sprain is much more susceptible of healing than any type of damage to the spinal column itself or to the cartilage therein. The testimony of both doctors clearly indicates that the plaintiff developed degenerative disc disease after his accident in 1972. Comparison of the 1978 and 1979 myelo-grams shows that although the 1979 fall might have increased the plaintiff’s symp-tomology, anatomically it did not make a noticeable difference in his condition.
ANALYSIS — ISSUE TWO
In Bloomer v. Liberty Mut. Ins. Co., 445 U.S. 74, 86-87, 100 S.Ct. 925, 932, 63 L.Ed.2d 215, 226 (1980), the United States Supreme Court states
The compensation award was intended to be an immediate and readily available payment to the injured longshoreman. By receiving this payment, the longshoreman was not foreclosed from pursuing an action against the ship owner. At the same time, he was not entitled to double recovery, and the stevedore [compensation insurer] would be reimbursed in full for his compensation payment. The result we reach enables the longshoreman to recover an amount no less than that which he would receive through an ordinary negligence action, and also immunizes the stevedore from liability in connection with the third-party action, (emphasis added.)
There is no doubt, we find, that Congress’ general intent in shaping the L.H.W. C.A. throughout the years has been to reduce litigation and to ensure that stevedores have sufficient funds to pay increased compensation. See Bloomer, supra at 100 S.Ct. 930-932 and Ochoa v. Employers Nat’l Ins. Co., 724 F.2d 1171, 1176 (5th Cir.), vacated, 469 U.S. 1082, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984), adhered to on remand, 754 F.2d 1196 (5th Cir.1985). Additionally, in Peters v. North River Ins. Co. of Morristown, New Jersey, 764 F.2d 306, 312 (5th Cir.1985) the court states
The courts, at least since the Etna, 138 F.2d 37 (3d Cir.1943), have uniformly held, however, that the employer has a subrogation right to be reimbursed from the worker’s net recovery from a third party for the full amount of compensation benefits already paid. See, e.g., Allen v. Texaco, Inc., 510 F.2d 977, 979-80 (5th Cir.1975). Moreover, the employer may intervene in the worker’s suit and assert a lien on the worker’s recovery to the extent of the compensation benefits it has paid. Id. Although Congress has not explicitly recognized the right to reimbursement in the statute, the legislative history of various amendments to the LHWCA makes it clear beyond question that Congress is aware that the courts have recognized a compensation *194 lien on third-party recoveries and, indeed, intends for the lien to “remain [] inviolable, consistent with Bloomer v. Liberty Mutual Insurance Co., 445 U.S. 74 [100 S.Ct. 925, 63 L.Ed.2d 215] (1980).” H.R. Rep. No. 1027, 98th Cong., 2d Sess. 36, reprinted in 1984 U.S.Code Cong. & Ad. News 2734, 2771, 2786. Bloomer recognizes that the compensation lien attaches to funds obtained by settlement or by judgment. Moreover, the lien recognized in Bloomer does not depend upon proof that the third party breached a duty to the employer or upon an agreement between the employer and the third party to settle a dispute between themselves. Rather, the right to reimbursement attaches to the proceeds of a judgment based upon the third party’s breach of duty to the worker or to the proceeds of a compromise agreement between the worker and the third party, at least where the agreement is silent with respect to the employer’s right to reimbursement. Bloomer also establishes that the employer is entitled to recoup from a third-party recovery the entire amount of the benefits paid without a reduction for its proportionate share of the litigation expenses and attorneys’ fees incurred by the worker. The compensation lien, however, attaches to the worker’s net recovery. See Ochoa v. Employers National Insurance Co., 724 F.2d 1171, 1177 (5th Cir.), vacated, [469] U.S. [1082], 105 S.Ct. 583, 83 L.Ed.2d 694 (1984), adhered to on remand, 754 F.2d 1196 (1985).... (emphasis in the original and emphasis added.)
Accordingly, we adopt the philosophy of Bloomer and Peters in that the compensation insurer should be reimbursed, in full, from the net recovery that the longshoreman receives from his third-party litigation. Therefore, even though the trial court properly recognized the compensation lien, it erred in allowing a reduction of the amount to be paid to the compensation insurer because the federal jurisprudence has interpreted Congressional intent to be that stevedores recover the full amount of compensation liens from the longshoreman's third-party recovery.
Other issues have been raised which either have no merit or are premature.
For the reasons assigned, the judgment of the trial court dated November 7,1986 is revised in part to read: “IT IS ORDERED there be judgment herein, recognizing the claim of intervenor, Liberty Mutual Insurance Company, as follows: wages: $105,-314, along with medical expenses of $31,-806, together with legal interest from date of judicial demand until paid.” In all other respects, that judgment, as revised, is affirmed.
REVISED AND AFFIRMED.